IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*Plaintiff*<br><br>Vs.<br><br>RAFAEL CORTEZ-OROPEZA<br>*Defendant* | CRIMINAL NO. 18-459 (PAD) |

**SENTENCING MEMORANDUM**

Hon. Pedro A. Delgado-Hernandez
U.S. District Court Judge

**Introduction**

Mr. Rafael Cortez-Oropeza is scheduled to appear before you on February 24, 2021 for sentencing. He was found guilty to Counts One and Two of the Indictment on March 11, 2020. The purpose of this memorandum is to request that the Court grant Mr. Cortez the lowest possible sentence consistent with the law of 180 months which is sufficient, but not greater than necessary after the Court weights in his §3553(a) factors.

**Criminal History**

In 1999 Mr. Cortes was charged in 3 independent cases of first degree murder. The police arrested and individual who later turned into a cooperator and based on his testimony charges were brought against Mr. Cortez. The murder cases pretty much rested on the testimony of one cooperator. In the balance of justice the prosecution would have 3 opportunities to obtain a conviction against Mr. Cortez, a conviction that would carry a mandatory life imprisonment sentence. On the other side of that balance a plea

1

offer for a 25 year concurrent conviction for second degree murder, a conviction that after 15 years with good time credit, Mr. Cortez would be back in the 'free community' at approximately 39 years of age. This type of deal worked for everyone, the prosecution closed 3 unsolved cases and Mr. Cortez was guaranteed to leave prison at some moment in his life.

While in prison Mr. Cortez's life in the outside took a turn, his mother passed away and his only son was born months after he got detained. This son is now 21 years of age, Mr. Cortez has seen him twice in his life but receives pictures of him every now and then. The young man lives in New York, goes to school and has made a life for himself absent his father. They have little contact as Mr. Cortez does not speak English well and his son speaks little Spanish.

In June of 2015 Mr. Cortez was released from prison and moved to his mother's residence in Camuy which was empty at the moment. He started to put his life together again, started to go to the church, meeting his neighbors and making new friends. One night while out in town there was a shooting in a local bar where various bystanders got hurt including Mr. Cortez who was shot in the legs and torso. He was treated in Puerto Rico's Medical Center but he had a serious infection which he feels was not handled well, so he got on a plane, flew to Florida and went straight to a hospital for treatment. After a week's hospitalization he was up and about and decided to start a new life in Florida, thinking as many Puerto Ricans do that life there was going to be better. After 2 months Mr. Cortez realized that he didn't speak the language, didn't know the city or had any

friends or family so he returned to Puerto Rico. Mr. Cortez moved back into his mother's residence and soon after he started doing odd jobs in construction and gardening with a neighbor that had a work crew.

**Facts of the Case**

   a. **The Search Warrant**

The Puerto Rico Police Bureau PRPB obtained confidential information that Mr. Cortez was storing a rifle for an individual named Amilcar Martinez Negron. After a 2 1/2 day surveillance police officer Angel Rosado Hernandez observed Mr. Cortez appear from behind his residence walking with a rifle next to his torso and entering the side entrance of the house. As ridiculous as this may sound that someone is simply walking on his patio with an illegal firearm for all to see in plain daylight, that information was taken to a Municipal Judge who approved a search warrant of the property.

The information provided failed to include that the posterior of the house had a door that could not be seen from any surveillance point where Mr. Cortez could have entered/exit with a bazooka and no one would have seen him. But during those precise 10 minutes of surveillance[1] at 5:25 in the afternoon that July 13, 2018 Mr. Cortez decided to exit the privacy of his home using the back door and enter the side door of the residence with the rifle for everyone to see.

---
[1] Agent's sworn statement to obtain search warrant states he arrived at 5:15pm and made the observation at 5:25pm.



Back door not visible from the street



Side door clearly visible from the street

We decided against a Frank's hearing and to confront agent Rosado Hernandez in front of the Jury, to our surprise the prosecution did not produce him to testify so no one testified as to the surveillance.

During the execution of the search warrant the police entered the residence and handcuffed Mr. Cortez and his girlfriend Mrs. Molina. After a short while Mr. Cortez showed the agents were he had the 3 firearms stored in the residence, all testimony present in Court demonstrated he was cooperative and respectful at all moments with the police officers. Mr. Cortez interviewed with the agents and drafted a document accepting reasonability and sole possession of the firearms in order for the police to release his girlfriend from custody.[2]

**b. Weapons**

The firearms recovered told a different story on their own. These firearms were old, rusty and in an incredibly bad condition which makes one wonder if some them even function. The .380 caliber Cobray pistol was in such bad state that perhaps it would have function better as a weight to keep a bedroom door open or a blunt object to hit an intruder over the head with. The Charter Arms .38 caliber slug nose revolver was also very old and rusty, our research shows it was probably a first generation model manufactured in 1964 when the company opened. **None of these old firearms had any ammunition**. The Tapco 7.62 mm caliber rifle was in a better condition that the other

---

[2] We attach the 'writing' as Exhibit 1 to demonstrate Mr. Cortez academic level.

firearms but we need to consider it was mostly plastic, the metallic parts were also rusty. This was the only firearm with ammunition, just 6 bullets were found of this caliber in the home.

Clearly these firearms were either vestiges of a past life, the level of physical damage and wear demonstrate that they were either buried or stored in bad conditions for years, or that they were weapons that were being stored for someone else as the PRPB thought when they were doing the surveillance. They were not your typical ready to use weapons or even your typical good condition weapons. The lack of ammunition also demonstrates that they were not weapons to be used or even carried.

**The Need for the Sentence Imposed To Promote Certain Statutory Objectives**

Before analyzing the statutory objectives of sentencing as they apply to this case, we must layout certain pertinent facts. Mr. Cortez is 46 years old. He was arrested on July 17, 2018. He is facing a mandatory minimum sentence of 15 years. Assuming the Court imposes the mandatory minimum sentence, Mr. Cortez will be released by approximately 2032 when he is 57 years old.[3]

For Mr. Cortez, the punitive purpose of sentencing can be achieved with the mandatory minimum sentence. That is because the punitive effect of any sentence is not viewed in a vacuum by simple, bland reference to an offense; rather, that effect is, and must be, measured against Mr. Cortez and his individual case. For him, the mandatory

---

[3] These estimates do not take into account any credits which may be applied by the Federal Bureau of Prisons.

minimum sentence represents significant punishment because it would be the second long prison term he will serve, which means he would have lived half his life inside prison.

Taking into account the sentencing data in the U. S. Sentencing Commission's *2016 Sourcebook of Federal Sentencing Statistics*[4], and the mean and median sentence for firearms is 75 and 51 months (respectively).[5] The mandatory minimum sentence in this case is 15 years or 180 months. This is more than double the total mean sentence and 4 times above the median sentence. Thus, the mandatory minimum sentence in this case is more than adequate to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

There are two aspects when discussing deterrence of criminal conduct, General Deterrence and Specific Deterrence. General deterrence aims to "discourage people from committing crimes". Specific deterrence aims to "dissuade the offender from committing crimes in the future".[6] As to general deterrence, the National Institute of Justice's *Five Things About Deterrence* paper (the "NIJ Paper")[7] points out that "it is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment." Mr. Cortez has been caught and will be punished for

---

[4] U. S. Sentencing Commission, *2016 Sourcebook of Federal Sentencing Statistics*. Retrieved August 8, 2017, from United States Sentencing Commission website: https://www.ussc.gov/research/sourcebook-2016.
[5] U.S. Sentencing Commission's *Sourcebook* Table 13.
[6] *Black's Law Dictionary* (10th ed. 2014).
[7] *Five Things About Deterrence*. (2016, May). Retrieved August 8, 2017, from National Institute of Justice website: https://nij.gov/five-things/pages/deterrence.aspx

his alleged crimes. This sends a clear message to society that law breakers will be caught and punished, thus achieving general deterrence. A lengthier prison sentence will not enhance the general deterrence effect.

As to specific deterrence, "[p]rison is an important option for incapacitating [i.e., individuals behind bars cannot commit additional crime] and punishing those who commit crimes, but the data show long prison sentences do little to deter people from committing future crimes."[8]  This case is an excellent example of this, Mr. Cortez was already withdrawn from society for 15 years and within 3 years of his reinsertion into society he was arrested again.  The research also consistently finds "that increases in already lengthy sentences produce at best a very modest deterrent effect."[9] Finally, the "aging out of crime" argument discussed below is also applicable to the specific deterrence factor.

The data on **recidivism** by the U.S. Sentencing Commission also supports our argument in this moment of Mr. Cortez's life.  The Commission's latest report on recidivism[10] states that "recidivism rates are most closely correlated with total criminal history points."[11] Rearrest rates for offenders with 9 Criminal History Points[12] are an alarming 76%. Offenders designated under the guidelines as career offenders and armed

---

[8] Ibid.
[9] Ibid.
[10] *Recidivism Among Federal Offenders: A Comprehensive Overview* (Rep.). (2016, March). Retrieved August 8, 2017, from United States Sentencing Commission website: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.
[11] Ibid. at 18.
[12] See Presentence Report paragraph 51 page 18.

8

career criminals receive substantially increased sentences because they are repeat offenders. These offenders have substantially higher recidivism rates than other offenders in the study group. In fact, those two groups of offenders have the highest recidivism rates of any group in this report. Taken together, these offenders had a rearrest rate of 69.5 %, compared to a rearrest rate of 48.7 % for all other offenders.[13]

But, "[s]tudies have repeatedly shown that older offenders at sentencing are at lower risk for reoffending, and the Commission's research confirms these findings." "Age at release also is associated with different rates of recidivism." In Mr. Cortez' case, statistics show that he is at the low point of the recidivism risk, 35.9%, because he is being sentenced at 46 years of age. However, if we take into account that he will be released when he is 57 years of age, his <u>recidivism rate drops to 24.7%.</u>[14] This is the second lowest recidivism rate when comparing offenders' age at release.[15] Other factors, such as gender (52.2% recidivism rate for males) and ethnicity (49.1% recidivism rate for Hispanics), place someone like Mr. Cortez at either a medium to a low risk of recidivism.[16] The conclusion when analyzing the data on recidivism is that Mr. Cortez is at an average low risk of recidivism based on his age, gender and ethnicity. Therefore, the recidivism scale tips in favor of imposing the mandatory minimum sentence on Mr. Cortez.

---

[13] Id at 19.
[14] The Recidivism rate at age over 60 drops to 16%
[15] Ibid. at 23.
[16] Ibid. at 24.

9

As a preliminary matter, Congress has explicitly directed that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). In other words, locking someone up neither achieves nor is a substitute for rehabilitation or achieving the goals set forth in § 3553(a)(2)(D). Thus, imprisoning Mr. Cortez for the term demanded by the guidelines cannot be justified on the basis of offering him any rehabilitation, education, or vocational training. After 15 years in prison during his 20s and 30s he definitely did not do a good job rehabilitating and starting a new life in his 40s, this will be his last chance and last chapter to do so, we can only hope that the Bureau of Prisons provide him with the tools and rehabilitation the Puerto Rico Department of Corrections failed to provide or he failed to take advantage of. In Mr. Cortez's case, he will be able to finally adequately finish his high school, learn English and other vocational skills which may appeal to him. The requested mandatory minimum sentence is more than enough to serve this purpose.

**Variance**

In this case, the probation officer application of the United States Sentencing Guidelines advises the Court that a proper sentence for Mr. Cortez is 235 to 293 months of imprisonment based on the ACCA enhancements. The application of ACCA increases Mr. Cortez Criminal History Category from IV to VI and the adjusted offense level from 29 to 33. Without the ACCA enhancements we are looking at a 121-151 advisory guideline with a 120 statutory maximum term of imprisonment; the ACCA enhancement doubles the advisory guideline range.

This is unreasonable and contrary to the mandate of 18 U.S.C. § 3553(a) which requires the imposition of a sentence that is sufficient, but not greater that necessary. The Court *should* reject the advice of the guidelines, because they are a poor guide to the minimally sufficient sentence for Mr. Cortez. The statutory penalties for this case should be 0 to 10 years of imprisonment but under the ACCA it is raised to 15 years to life. In summary, the relevant statutes require a sentence of at least 15 years and up to life imprisonment if ACCA is applied.

*Kimbrough v. United States*, 552 U.S. 85 (2007) and its progeny have established for over 10 years that a categorical disagreement with and variance from the Guidelines is not suspect and have recognized district courts' authority to vary from a guideline based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case. Courts of appeals have expanded the rationale of *Kimbrough* to include variances based on policy disagreements with the child pornography, career offender, firearms, offender characteristics and immigration guidelines. While courts may choose to vary based on a policy disagreement, they do not have to and can choose to agree with a guideline on policy grounds.

It will not be an abuse of discretion of the Court to sentence Mr. Cortez to 180 months of imprisonment since sentencing him within the advisory guideline would create a sentencing disparity and yield a sentence 'greater than necessary' to achieve § 3553(a)'s purposes. *Gall v. United States*, 552 U.S. 38 (2007), clearly state that sentencing

11

courts need not justify sentences outside the guideline range through "extraordinary" circumstances: the district court need only "take into account the § 3553(a) factors and recognize that the guidelines are not mandatory."

**Conclusion**

"Although the sentencing judge is obliged to consider all of the sentencing factors outlined in section 3553(a), the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances. That is the historic role of sentencing judges, and it may continue to be exercised, subject to the reviewing court's ultimate authority to reject any sentence that exceeds the bounds of reasonableness". *U.S. v. Jones*, 460 F.3d 191 (2d Cir. 2006). A sentencing court has the right —indeed, the duty — to evaluate the nature and circumstances of the offense of conviction and the characteristics and history of the offender. The court must then quantify that evaluation in a sentence that is fair, just, and in accordance with law. *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008).

It is not unreasonable for a Sentencing Judge to take into consideration the guideline range, but it must also take into consideration the factors set forth in §3553. The Court states that *"we emphasized the broad discretion enjoyed by district courts in fashioning sentences that fully and adequately reflect the penological factors set forth in 18 USC §3553(a)"*. See also *US v. Whitehead*, 532 F. 3d 991 (9th Cir. 2008) at 993.

We respectfully believe that we have provided the Court with enough reasons to grant Mr. Cortez a term of imprisonment of **180 months**. Society's interest in

punishing the conduct in which Mr. Cortez incurred, should be reasonable and not greater than necessary to accomplish the goal of sentencing and rehabilitating the defendant. With the Court taking into consideration the above-mentioned circumstances of this case we respectfully request Court after evaluating the sentencing factors outlined in section 3553(a) and applying the Court's own sense of what is a fair and just sentence under all the circumstances, sentence Mr. Cortez to the lowest term of imprisonment.

In summary we request the Court the following:

a. That the Court Sentence Mr. Cortez to a term of imprisonment of 180 months;

b. A term of Supervised Release of 5 years;

We thank the Court for its consideration of this matter.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that today, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such to the U. S. Attorney's Office for the District of Puerto Rico.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 18th day of February 2021.

/S/ Miguel Oppenheimer
Miguel Oppenheimer
USDC Bar No. 220012
P.O. Box 10522
San Juan, PR 00922-0522
Tel. 787-375-6033
miguelo@oppenheimerlaw.com